231 P.3d 819 (2010)
2010 UT App 111
STATE of Utah, in the interest of D.B., a person under eighteen years of age.
D.B., Appellant,
v.
State of Utah, Appellee.
No. 20080837-CA.
Court of Appeals of Utah.
May 6, 2010.
*820 Wayne A. Freestone, Sandy, for Appellant.
Mark L. Shurtleff and Kenneth A. Bronston, Salt Lake City, for Appellee.
Before Judges DAVIS, THORNE, and BENCH.[1]

OPINION
THORNE, Judge:
¶ 1 D.B. appeals from the juvenile court's adjudication finding him guilty as an accomplice, see Utah Code Ann. § 76-2-202 (2008), on allegations of theft, see id. § 76-6-404, and criminal trespass, see id. § 76-6-206(2). We affirm.

BACKGROUND
¶ 2 An eyewitness contacted police dispatch to report that two juvenile boys were attempting to break the padlocked gate to a construction site. Police responded and arrested D.B. and another juvenile.
¶ 3 The State filed a petition alleging twelve instances of criminal conduct including allegation four that D.B. had committed theft, see id. § 76-6-404, and allegation five that D.B. had committed criminal trespass, see id. § 76-6-206(2). D.B. admitted to allegation one and the State dismissed allegations two and three. The juvenile court held a trial and heard evidence concerning allegations four and five, reserving the remaining counts for trial at a later date. At trial the eyewitness testified that the two boys were "hitting the fence padlock with either a rock or some type of bar" and "[b]oth tried to . . . climb the fence and they both jumped off and *821 then one of the [d]efendants climbed into the fence and . . . [went] around to the back of the trailer."[2] The eyewitness further testified that the other boy who was unable to climb the fence waited and acted "[a]s a watch-out." When asked what he meant by that and what did the boy do, the eyewitness stated that the other boy "[a]ppeared to be nervous, just looking around." The eyewitness also testified that he watched the boy that was inside of the fence the whole time until the police arrived.[3] The codefendant, however, testified that both he and D.B. jumped the fence and both had the bolt cutters in their possession.[4] When the police arrived they found D.B. outside the fenced area and the other boy, D.B.'s codefendant, inside the fenced area.[5] After the trial, the juvenile court announced that because the parties were returning to court on the remaining allegations related to the matter, it would give its trial verdict at that time. Thereafter, the juvenile court announced its adjudication finding D.B. guilty, as an accomplice, of theft and criminal trespass.

ISSUE AND STANDARD OF REVIEW
¶ 4 D.B. argues that his guilt as an accomplice was neither alleged nor argued at trial and therefore the juvenile court's decision finding him guilty on the theory of accomplice liability was in violation of his due process rights. This issue presents a question of law that we review for correctness. See Chen v. Stewart, 2004 UT 82, ¶ 25, 100 P.3d 1177 ("Constitutional issues, including questions regarding due process, are questions of law that we review for correctness."). When our review of such questions involves underlying factual issues, "we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." Id.

*822 ANALYSIS
¶ 5 D.B. asserts that the juvenile court's finding of accomplice liability was in violation of his due process rights because the State neither gave D.B. specific notice that it was pursuing an accomplice liability theory nor did the State actually request that the juvenile court utilize such a theory. The State initially responds that D.B. failed to preserve his due process challenge in the juvenile court. We first consider the threshold issue of whether D.B. preserved the issue for appellate review.
¶ 6 To preserve an issue for appeal, the issue must have been presented to the trial court in such a way that the court has an opportunity to rule on that issue. See 438 Main St. v. Easy Heat, Inc., 2004 UT 72, ¶ 51, 99 P.3d 801. "This preservation rule has been extended to apply to every claim unless a [party] can demonstrate that exceptional circumstances exist or plain error occurred." Lunt v. Lance, 2008 UT App 192, ¶ 23, 186 P.3d 978 (alteration in original) (internal quotation marks omitted). Issues that are not raised at trial are generally deemed to be waived. See 438 Main St., 2004 UT 72, ¶ 51, 99 P.3d 801. The presence of a constitutional issue does not excuse an appellant from complying with the preservation rules set by the supreme court and the Utah Rules of Appellate Procedure. See O'Dea v. Olea, 2009 UT 46, ¶ 18, 217 P.3d 704.
¶ 7 Rather than arguing that D.B. properly preserved the issue for appeal or advancing grounds upon which we may review an unpreserved issue,[6] D.B. argues that preservation is irrelevant. In particular, D.B. argues that he was not obligated to raise his objection at trial since there was nothing to object to during the trial because the State gave no indication that it was pursuing a theory of accomplice liability.
¶ 8 I disagree that D.B. was not given notice that such a theory was being pursued. Without determining the type of notice the prosecution must give at trial, I note that accomplice liability is not a separate offense from principal liability, see State v. Gonzales, 2002 UT App 256, ¶ 12, 56 P.3d 969, and "[i]t is well settled that accomplices incur the same liability as principals," id. Moreover, "a person charged with a crime has adequate notice of the possibility of accomplice liability being raised at trial because conviction of accomplice and principal liability do not require proof of different elements or proof of different quality."[7]Id. As such, *823 it may reasonably be presumed that D.B. was aware that even if he successfully defended against principal liability that should the evidence demonstrate that he solicited, requested, commanded, encouraged, or intentionally aided another person to engage in conduct which constitutes an offense he could be found responsible as an accomplice. Cf. State v. White, 577 P.2d 552, 554 (Utah 1978) (finding an evidentiary basis upon which to instruct on either principal or accomplice liability and rejecting the defendant's argument that the trial court erred in instructing the jury on aiding and abetting when the defendant was charged and tried as the principal in the crime and not as one who aided someone else in its commission).
¶ 9 After the presentation of testimony, which included testimony that would support both principal and accomplice liability theories, D.B. had several opportunities to challenge the application of accomplice liability. The first opportunity arose when the State, during its closing argument in rebuttal, argued accomplice liability stating,
I didn't mean to misinform, if I stated that both climbed the fence. . . . But the problem [the defense] has with this whole case is: No matter where [D.B.] was, it was clear, [the eyewitness] says he was a lookout. . . . [The eyewitness] thought he was a lookout, he was watching things, and so he's just as responsible for what his Co-defendant does as if he committed that crime.
This comment was a clear statement that the State was not foregoing an accomplice liability theory. Moreover, the State, after hearing D.B.'s closing argument, which largely focused on principal liability,[8] clarified that the State was indeed pursuing an accomplice liability theory by asserting that D.B. was liable for criminal trespass and theft since D.B. intentionally aided his codefendant by acting as a lookout. As such, D.B. had additional notice that the State was pursuing an accomplice liability theory and, at that point before disposition, had an opportunity to object and request a continuance if he needed more time to tailor a defense due to an unfair surprise assertion of accomplice liability.
¶ 10 The next opportunity D.B. had to raise his due process claim occurred when the juvenile court announced in open court, approximately three weeks after trial, D.B.'s guilt on the theory of accomplice liability.[9] There was nothing to prevent D.B. from alerting the juvenile court at the time of disposition or thereafter in a postjudgment motion, see Utah R. Juv. P. 44, 47, 48(a),[10] that the State had failed to argue accomplice liability and arguing that D.B. had not been given an opportunity to present a defense to this alternate theory. Although a postjudgment motion on an issue is not necessary if D.B. had otherwise raised the issue, a timely postjudgment motion may in some instances be used to preserve an issue not previously raised if the court considers and rules on the issues raised in a postjudgment *824 motion. Cf. Normandeau v. Hanson Equip., Inc., 2009 UT 44, ¶ 23, 215 P.3d 152 ("`[O]nce trial counsel has raised an issue before the trial court, and the trial court has considered the issue, the issue is preserved for appeal.'" (alteration in original) (internal quotation marks omitted)); State v. Belgard, 830 P.2d 264, 265-66 (Utah 1992) (holding that issues raised and dealt with in posttrial evidentiary hearings are preserved for appeal).
¶ 11 D.B.'s failure to object either at trial, at the time of adjudication, or through a postjudgment motion deprived the juvenile court of its opportunity to address the claimed error and, if merited, correct it. See Lunt v. Lance, 2008 UT App 192, ¶ 24, 186 P.3d 978. Accordingly, we conclude that D.B. failed to preserve his due process claim and we affirm the juvenile court's determination.

CONCLUSION
¶ 12 D.B. was on notice that when charged with a criminal violation he could be convicted as either a principal or as an accomplice at trial. The State did not affirmatively exclude application of accomplice liability. D.B. had several opportunities to assert that application of such a theory was done in violation of his due process. D.B. failed to object to this theory during the State's presentation of the evidence that would support D.B.'s guilt under an accomplice liability theory. Likewise, D.B. failed to raise the issue either at the adjudication hearing wherein the juvenile court explicitly applied the theory of accomplice liability or thereafter through a postjudgment motion. D.B.'s failure to raise the issue deprived the juvenile court of its opportunity to address the claimed error and, if merited, correct it. Thus, we conclude that D.B. failed to preserve his due process claim and we affirm the juvenile court's determination.[11]
BENCH, Senior Judge (concurring in the result):
¶ 13 I am willing to assume that, before the juvenile court entered its ruling, D.B. did not have fair notice that the State was relying on a theory of accomplice liability. But once the juvenile court ruled, D.B. certainly knew that accomplice liability was the basis for the court's decision. Although D.B. could easily have raised the issue in a postjudgment motion, he did absolutely nothing to bring his objection to the attention of the juvenile court. Instead, D.B. attempts to raise this issue for the first time on appeal. Because this issue was not preserved below, we should not address it.
¶ 14 Issues "not raised before the trial court may not be raised [for the first time] on appeal." State v. Holgate, 2000 UT 74, ¶ 11, 10 P.3d 346.
[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue. This requirement puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding. For a trial court to be afforded an opportunity to correct the error (1) the issue must be raised in a timely fashion[,] (2) the issue must be specifically raised[,] and (3) the challenging party must introduce supporting evidence or relevant legal authority.
438 Main St. v. Easy Heat, Inc., 2004 UT 72, ¶ 51, 99 P.3d 801 (alterations in original) (citations and internal quotation marks omitted). This court will not address an unpreserved issue absent either plain error or exceptional circumstances, see Holgate, 2000 UT 74, ¶ 11, 10 P.3d 346, neither of which exceptions D.B. properly raises on appeal. See supra ¶ 7 n. 6.
¶ 15 The dissent claims that D.B. should not be penalized for his failure to raise the issue below because a postjudgment motion is neither necessary nor sufficient to preserve this issue for appeal. It was entirely possible and appropriate for D.B. to raise the *825 issue of notice of the accomplice liability theory in a postjudgment motion. Rule 48 of the Utah Rules of Juvenile Procedure states that "[n]ew hearings shall be available in accordance with [rules] 52, 59, and 60 [of the Utah Rules of Civil Procedure]." Utah R. Juv. P. 48(a). Rule 59 of the Utah Rules of Civil Procedure allows a party to receive a new trial if there is, among other grounds, "[an i]rregularity in the proceedings of the court . . . or abuse of discretion by which either party was prevented from having a fair trial." Utah R. Civ. P. 59(a)(1). Rule 60(b) of the Utah Rules of Civil Procedure allows a party relief from a judgment on, among other grounds, surprise or "any other reason justifying relief from the operation of the judgment." Id. R. 60(b).[1] Thus, a postjudgment motion would have been sufficient to preserve the issue and was also necessary. See generally In re K.F., 2009 UT 4, ¶ 61, 201 P.3d 985 (stating that although "superfluous to demand that a party challenge the evidentiary support for a court's findings shortly after the court articulates them," it is "wholly necessary for a party to challenge and thus afford the trial court an opportunity to correct [an] alleged error" (internal quotation marks omitted)); 438 Main St., 2004 UT 72, ¶¶ 55-56, 99 P.3d 801 (concluding that a plaintiff could have raised the issue of the sufficiency of detail of a trial court's factual findings in a postjudgment motion for a new trial but failed to do so and thereby failed to preserve the issue for appeal); Holgate, 2000 UT 74, ¶¶ 14-16, 10 P.3d 346 (concluding that "a [criminal] defendant must raise [an objection to] the sufficiency of the evidence by proper motion or objection[, including by postjudgment motion,] to preserve the issue for appeal" so that "the issue will be brought to the trial court's attention and the trial court will have the opportunity to address the issue").[2]
¶ 16 The cases cited by the dissent do not stand for the proposition that a postjudgment motion is unnecessary or insufficient to preserve issues for appeal. In Sittner v. Schriever, 2000 UT 45, 2 P.3d 442, the supreme court noted that the preservation rule does not "require a party to file a postjudgment motion before the trial court as a prerequisite to filing an appeal." Id. ¶ 16. The court concluded, however, that the party there had already preserved the issues he appealed: two issues were briefed in motions and other pleadings, and the other issue was one of appellate procedure over which the trial court "lacked authority and jurisdiction." Id. ¶ 17. Thus, Sittner merely stands for the proposition that, while a party must raise an issue before the trial court to preserve it, a party is not required to raise it a second time in a postjudgment motion. In the other case cited by the dissent, State v. Erickson, 722 P.2d 756 (Utah 1986) (per curiam), the supreme court held that a defendant failed to preserve for appeal an evidence suppression issue. See id. at 759. The defendant there failed to timely raise the issue in a motion to suppress or at trial and instead attempted to raise the evidentiary issue improperly in a postjudgment motion. See id.
¶ 17 In my opinion, if D.B. lacked notice of the accomplice liability theory at trial, it was necessary for him to raise the issue in a postjudgment motion. And absent a postjudgment motion requesting that the trial court determine whether D.B. had adequate notice of the accomplice liability theory, this issue was not preserved for appeal.
¶ 18 I therefore concur in affirming the judgment.
DAVIS, Presiding Judge (dissenting):
¶ 19 First, I write separately to correct the lead opinion's misleading characterization of *826 the evidence and argument presented at trial. Second, I write to respond to the lead opinion's erroneous statements regarding the level of notice that the prosecution must provide at trial regarding the theory of guilt it is pursuing. Third, I dissent from the lead opinion's reasoning that "D.B. had several opportunities to challenge the application of accomplice liability," see supra ¶ 9, and the lead opinion's conclusion that under the circumstances an objection was required to permit appellate review.

I. The Presentation of Evidence and Argument at Trial
¶ 20 The lead opinion incorrectly represents that the evidence produced by the State clearly supported that D.B. was acting as an accomplice. The evidence does so only when it is rearranged and edited in a way that is not consistent with the way in which is was presented at trial. The lead opinion sets forth only the evidence that, when combined together[1] and considered in isolation from the remainder of the evidence and argument presented at trial, could have supported the trial court's conclusion as to accomplice liability.[2] But the question here is whether the evidence and argument at trial, taken as a whole, gave D.B. notice that the State was pursuing a conviction under an accomplice liability theory. Cf. State v. Wilcox, 808 P.2d 1028, 1032 n. 1 (Utah 1991) ("[T]he constitutional adequacy of the evidence in this case is not the issue before this court today; rather, it is whether [the defendant] is sufficiently apprised of the evidence supporting the case against him to prepare a defense against that case. We should not distort the constitutional notice analysis by importing considerations that may be appropriate under other constitutional provisions."). Thus, we are obligated to consider the evidence as presented at trial in our consideration of the issue raised on appeal.
¶ 21 The evidence and argument, as it was presented at trial, simply did not signal that the State was pursuing an accomplice liability theory of guilt. Directly following the eyewitness's testimony that D.B. was the boy who crossed the fence, the State called D.B.'s codefendant to the stand. The codefendant testified that both he and D.B. had jumped over the fence and that they had acted together in stealing the bolt cuttersD.B. being the one who first took possession of the bolt cutters and wanted to take them. The codefendant also testified that only D.B. had jumped back out of the fenced area before the police arrived.[3] This account was consistent with the police officers' testimony, which was the next testimony the State chose to present, that when they arrived at the scene, D.B. was outside the fenced area while his codefendant was inside. Thus, the testimony of the eyewitness and the codefendantboth indicating that D.B. had actually entered into the fenced areaclearly supported liability as a principal, and the presentation of this testimony in no way indicated that the State intended to argue liability as an accomplice.
¶ 22 Indeed, of all the evidence produced and statements uttered at trial, the only one that can be construed to be arguing accomplice liabilityand then only when generously *827 construed in a light favorable to the Stateis one statement by the prosecutor in his rebuttal closing argument. But contrary to the representation made by the lead opinion, the rebuttal closing argument did not "clarif[y] that the State was indeed pursuing an accomplice liability theory," see supra ¶ 9 (emphasis added). Instead, the rebuttal closing argument was a change from what the prosecutor had argued minutes before in his original closing argument, which had clearly set forth the theory that D.B. was guilty as a principal:
[The eyewitness] observed both of them to eventually climb and jump into the area. He said they got in and went around, they appeared to be nervous. He was concerned enough that he contacted the local police department.
. . . [The codefendant] testified that they went into the fenced area, him and [D.B.] both. [D.B.] grabbed the bolt cutters, tossed them to him, and told him to throw them over the fence. . . .
The bottom line is, [the codefendant] indicated that they both crossed the fence, that fenced area that's padlocked, which would cover the trespass. And then an item that they located in that area was thrown over the fence, which shows an intent to steal something, which should cover the theft as well. . . . Therefore [D.B.] should be found guilty of both charges.
Defense counsel then responded, pointing out the State's misstatement of the eyewitness's testimony and arguing that D.B. committed neither trespass nor theft:
The fact is, [D.B.] never did go into the construction yard, and, consequently, there was no criminal trespass on his behalf.
. . . The fact of the matter is that there just isn't any evidence that [D.B.] entered into the construction yard and had possession of any bolt cutters or anything else that would indicate he wasthat he, in fact, committed a theft.
After this, the prosecutor corrected himself, made a new misstatement of the eyewitness's testimony, and then made the State's first allusion whatsoever to accomplice liability:
I didn't mean to misinform, if I stated that both climbed the fence. . . . But the problem [the defense] has with this whole case is: No matter where [D.B.] was, it was clear, [the eyewitness] says he was a lookout. . . . He thought he was a lookout, he was watching things, and so he's just as responsible for what his [codefendant] does as if he committed that crime. And he should be found guilty, Your Honor.
Thus, this statement from the rebuttal closing argument was far from clarifying something that the State had argued all along but was, instead, the first mention at trial even mildly suggestive of accomplice liability.

II. The Issue on Appeal and the Corresponding Law
¶ 23 Interestingly, although the lead opinion says that it does not "determin[e] the type of notice the prosecution must give at trial," supra ¶ 8, it essentially goes on to conclude that no notice is necessary so long as the defendant is "charged with a criminal violation"; "[t]he State [does] not affirmatively exclude application of accomplice liability"; and there exists "evidence that would support . . . guilt under an accomplice liability theory," regardless of whether such evidence was actually used in that manner, supra ¶ 12 (emphasis added). And although the lead opinion reframes the issue as one of preservation, the two are essentially the same issuewhether D.B. was given adequate notice (either notice to object or to prepare a defense). I think that in such a situation, where we essentially reach the issue on appeal in our determination of the "threshold issue" of preservation, reliance on the preservation rule to affirm the lower court is less than helpful.
¶ 24 As to the analysis of the notice requirement, the lead opinion misconstrues the relevant case law. The parties agree regarding the liability of accomplices and that, as the lead opinion quotes, "a person charged with a crime has adequate notice of the possibility of accomplice liability being raised at trial because conviction of accomplice and principal liability do not require proof of different elements or proof of different quality," State v. Gonzales, 2002 UT App 256, *828 ¶ 12, 56 P.3d 969 (emphases added). But this is entirely unhelpful in shedding light on the question of what constitutes constitutionally sufficient notice that accomplice liability is being raised at trial. See generally U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation. . . .").[4]
¶ 25 Further, as I referenced above, see supra ¶ 20, the lead opinion mistakenly places emphasis on the sufficiency of the evidence to support the trial court's determination. The lead opinion argues that so long as the evidence is sufficient to support an accomplice liability theory, the defendant must defend against it, regardless of whether such a theory was argued by the prosecution at trial. See supra ¶ 8. But I do not agree that the mere existence of facts that could have been used to support a certain theory is relevant if the theory is never actually raised at trial. And the only authority the lead opinion cites for such a proposition is a case in which there was sufficient evidence to support a jury instruction on accomplice liability, which instruction would have clearly put the defendant on notice at trial that such a theory was being considered, see State v. White, 577 P.2d 552, 554 (Utah 1978). Certainly had the accomplice liability theory been advanced at trial, I wholeheartedly agree that there would have been sufficient evidence to support the theory. But this is precisely the pointthe theory was not advanced at trial and therefore the defense could not be expected to challenge such a theory. Cf. Lankford v. Idaho, 500 U.S. 110, 120, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991) (recognizing that although there were no limits placed on the defense counsel's preparation, "it was surely reasonable for the defense to assume that there was no reason to present argument or evidence directed at whether the death penalty was either appropriate or permissible" where the prosecution never argued for the application of the death penalty).
¶ 26 Instead, an instructive case for the issue on appeal is Lankford v. Idaho, 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991). In Lankford, after the defendant had been found guilty, the State did not argue in the sentencing phase for the imposition of the death penalty but instead asked for an indeterminate life sentence. See id. at 116, 111 S.Ct. 1723. In response, although the evidence could have supported a death penalty sentence, the defense understandably made no argument against the imposition of the death penalty but instead focused its argument on urging a shorter sentence than the sentence recommended by the State. See id. At the conclusion of the hearing, the trial court made a statement that included a brief and somewhat unclear mention of the death penalty. See id. at 116-17, 111 S.Ct. 1723.
At the beginning of this lengthy statement, [the trial court] described the options available to the court, including the indeterminate life sentence recommended by the State, "or a fixed life sentence for a period of time greater than the number of years he would serve on a indeterminate life sentence, i.e., ten. For example, a fixed term of 40 years or death or a fixed life sentence."
Id. Apparently, no objection was made by the defense to the passing reference to the death penalty. A few days later, the trial court sentenced the defendant to death. See id. at 117, 111 S.Ct. 1723. The defendant petitioned for postconviction relief, which the trial court denied; and the denial was subsequently affirmed by the Idaho Supreme Court. See id. at 118, 111 S.Ct. 1723. The United States Supreme Court, however, reversed. *829 See id. at 128, 111 S.Ct. 1723. Although acknowledging that "the trial judge's power to impose a sentence that is authorized by statute is not limited by a prosecutor's recommendation," the Court clarified that "[t]he issue is one of adequate procedure rather than substantive power." Id. at 119, 111 S.Ct. 1723. "The question . . . is whether it can be said that counsel had adequate notice of the critical issue that the judge was actually debating. Our answer to that question must reflect the importance that we attach to the concept of fair notice as the bedrock of any constitutionally fair procedure." Id. at 120-21, 111 S.Ct. 1723. "If notice is not given, and the adversary process is not permitted to function properly, there is an increased chance of error, and with that, the possibility of an incorrect result." Id. at 127, 111 S.Ct. 1723 (citation omitted). Notwithstanding the one brief reference to the death penalty at the close of the sentencing hearing, the Court ultimately determined that the defendant had a "lack of adequate notice" that the death penalty was at issue and that this "created an impermissible risk that the adversary process may have malfunctioned in this case." Id.
¶ 27 The case before us is similar to Lankford. Although the trial here ended with one brief comment by the prosecutor that could have been interpreted as suggesting a theory of accomplice liability, such a theory was not argued or advanced prior to the parting comment. Instead, the State had clearly pursued another theory of liability in its argument at trial. Thus, the defense did not receive adequate notice of the ultimate issue upon which the case would be decided. I do not think, nor apparently did the Lankford Court, that one vague allusion to an issue at the close of the presentation of evidence and argument qualifies as constitutionally adequate notice.[5] Indeed, the several cases cited by the parties on appeal support the proposition that notice of an accomplice liability theory must be given at trialcontrary to what the lead opinion concludesand that notice must be given in a more direct fashion than in one parting comment after the defense has finished arguing its case. See Calderon v. Prunty, 59 F.3d 1005, 1009 (9th Cir.1995) (determining that adequate notice was given at trial because the prosecutor's opening argument essentially set forth the contested theory); State v. Mancine, 124 N.J. 232, 590 A.2d 1107, 1121 (1991) (stressing that the defense was aware of the accomplice liability theory, stating, "In fact, in his closing argument, defense counsel emphasized that the State had two `alternative' theories in an attempt to raise reasonable doubt in the minds of the jurors."); Commonwealth v. Smith, 334 Pa.Super. 145, 482 A.2d 1124, 1127 (1984) (noting that "[the defendant's] criminal liability as an accomplice was advanced repeatedly during the trial in which he attempted to transfer criminal responsibility to [his codefendant]"); State v. Gonzales, 2002 UT App 256, ¶ 9, 56 P.3d 969 (explaining that the State did not change its position but, rather, the defendant "was tried and convicted as a principal").

III. The Failure to Object Below

A. The Rebuttal Closing Argument
¶ 28 It may be true that the statement from the prosecutor's rebuttal closing argument *830 could have brought to mind the idea of accomplice liability. But I do not believe that after a trial full of evidence directly supporting principal liability and the prosecutor arguing principal liability in his original closing argument, this one statement in the final minutes of trial, which statement did not even specifically mention accomplice liability, was sufficient to put the defense on notice that the State was pursuing an accomplice liability theory.[6] As just discussed above, such a parting reference is not sufficient to provide constitutionally adequate notice to a defendant. I therefore do not agree that we should fault a defendant for failing to object to such a reference.
¶ 29 Furthermore, even assuming that the statement made in the State's rebuttal closing argument caused D.B.'s counsel to begin questioning whether accomplice liability was now being suggested, he could not reasonably have been expected to object and provide the State with another theory of liability in time for the State to amend its argument and specifically argue the theory. And it certainly is not the responsibility of the defense to assure that the State takes the necessary steps to present its case so as to properly convict the defendant.
¶ 30 Moreoverand most importantly D.B.'s argument on appeal is not that the statement made during the rebuttal closing argument was somehow inappropriate, i.e., some sort of prosecutorial misconduct. Instead, his argument is that the trial court violated D.B.'s due process rights by basing its finding of guilt on an accomplice liability theory that was not pursued or argued in any fashion that would allow D.B. to prepare a defense at trial. Thus, the error that D.B. challenges occurred when the trial court made its decision three weeks after the trial. I therefore think it is totally unreasonable to fault D.B. for not raising the issue at trial before the error complained of actually even occurred. The statement in the rebuttal closing argument simply does not qualify as one of D.B.'s "several opportunities to challenge the application of accomplice liability," see supra ¶ 9, when the statement was made weeks before the application of the theory.

B. The Announcement of the Trial Court's Final Decision
¶ 31 When the trial court announced its decision three weeks after trial, it was clear that the trial court was not convinced that D.B. acted as a principal in the theft or trespass:
I find that [the eyewitness's] testimony was credible. [The codefendant] testified that both he and [D.B.] jumped the fence, and both had . . . the bolt cutters in their possession. I don't find that was credible, not only based on the fact that [the eyewitness] only saw one individual climb the fence. And when the police arrived, there was one individual inside the fence [ (the codefendant) ] and one individual outside the fence [ (D.B.) ]. And so, I just didn't find that [the codefendant] was credible, and that both boys jumped the fence.
Instead, the trial court determined that D.B. was guilty as an accomplice. This occasion was what the lead opinion considers the second of D.B.'s "several opportunities" to object.
¶ 32 I do not agree that in order to preserve the issue for appeal D.B. was required to object to an error made in the trial court's final ruling, which was handed down several weeks after trial had concluded. The lead opinion relies on 438 Main St. v. Easy Heat, Inc., 2004 UT 72, 99 P.3d 801, for the proposition that such an objection is mandatory. See supra ¶ 6. However, that case ultimately cites to Badger v. Brooklyn Canal Co., 966 P.2d 844 (Utah 1998), as authority for the proposition, see 438 Main St., 2004 UT 72, ¶ 51, 99 P.3d 801, and Badger clarifies the rule: "In a trial setting, to preserve an issue for appellate review, a party must first raise the issue in the trial court. . . . Issues not raised at trial are usually deemed waived," 966 P.2d at 847 (emphases added).
*831 ¶ 33 Such a distinctionbetween whether the error actually occurred at trial or whether it occurred in the trial court's decision after trialis in harmony with the policies behind the preservation rule. One purpose of the preservation rule "is to put[] the judge on notice of the asserted error and allow[ ] the opportunity for correction at that time in the course of the proceeding." Id. (alterations in original) (internal quotation marks omitted); see also Tschaggeny v. Milbank Ins. Co., 2007 UT 37, ¶ 20, 163 P.3d 615. Here, any objection raised as the trial court delivered its decision would not have allowed "for correction at that time in the course of the proceeding," see Badger, 966 P.2d at 847 (internal quotation marks omitted), because the proceedings were already completed. In fact, considering the trial court's specific finding that D.B. was not guilty as a principal, had the court recognized its mistake at this juncture, the only remaining option would have been to simply change the ultimate conclusion and acquit D.B.[7] Thus, no sort of judicial economy would have been served by objecting at this point. Further, the trial court did not need D.B. to put it on notice of the errorthat the trial court was finding liability on an argument not advanced by the State. Indeed, it was the trial court that had raised the issue to the parties' attention, considered relevant case law, and made a decision respecting the issue:
Now, I have also looked at the case of [State v. Gonzales, 2002 UT App 256, 56 P.3d 969,] that indicates that: "Accomplice liability is not a separate offense from principal liability, so it does not require specific notice or indictment or information because it is well-settled that accomplice[s] incur the same liability as principals."[[8]]
Thus, the trial court, which was well aware that the defense had never been put on notice of the accomplice liability issue at trial, sua sponte raised and answered the question of whether it could in such circumstances still find guilt on an accomplice liability theory.[9]
¶ 34 Another purpose of the preservation rule is that it "prevents a party from avoiding the issue at trial for strategic reasons only to raise the issue on appeal if the strategy fails." Tschaggeny, 2007 UT 37, ¶ 20, 163 P.3d 615. Again, the error here did not occur "at trial," and there is no conceivable strategic advantage to D.B. by not raising the issue after the matter had already been concluded. Thus, where the error did not occur at trial and none of the purposes of the preservation rule are applicable here, I do not agree that the preservation rule prevents our review of the issue on appeal. Cf. ABCO Enters. v. Utah State Tax Comm'n, 2009 UT 36, ¶¶ 8-12, 211 P.3d 382 (refusing to apply the preservation rule because none of the situations where the rule was applicable were present in the case).

C. A Postjudgment Motion
¶ 35 According to the lead opinion, the third of D.B.'s "several opportunities" to object *832 was to submit a postjudgment motion. It is true that in some unique situations an issue not preserved at trial may be preserved if the trial court considers and rules on the issues raised in a postjudgment motion. However, I do not believe the case before us is one such situation. The situations referenced by the lead opinion appear to be limited to those where motions to suppress evidence were not timely filed five days prior to trial, resulting in a waiver from which the trial court is specifically authorized to grant relief under the rules of criminal procedure. See State v. Belgard, 830 P.2d 264, 265-66 (Utah 1992).[10] Thus, in those instances it is not the postjudgment motion that preserves the issue for appeal; rather, the issue is preserved because the trial court has chosen to address the suppression issue and because the trial court is specifically authorized to grant relief from a defendant's waiver of such suppression issues.
¶ 36 Generally, a postjudgment motion itself is neither necessary nor sufficient to preserve an issue for appeal. See Sittner v. Schriever, 2000 UT 45, ¶ 16, 2 P.3d 442 ("Defendants correctly state the general rule that failure to raise an argument before the trial court precludes a party from raising that argument on appeal. However, this rule does not require a party to file a post-judgment motion before the trial court as a prerequisite to filing an appeal." (citation omitted)); State v. Erickson, 722 P.2d 756, 759 (Utah 1986) (per curiam) ("Although [the defendant] did raise the issue in post-trial motions, this did not preserve the point for appeal."). Thus, I do not agree with the lead opinion's reliance on the opportunity to file a postjudgment motion as one of D.B.'s "several opportunities" to object to the application of an accomplice liability theory. Nor do I agree that the failure to file a postjudgment motion in any way supports the conclusion that the issue was not preserved for appeal. Simply stated, if a postjudgment motion is not necessary to preserve an issue for appeal, D.B.'s failure to file such a motion is wholly irrelevant to the preservation analysis.
¶ 37 Although the concurring opinion may be correct that there are several procedural rules that would allow for postjudgment motions to be filed in this case, there is nothing in those rules supporting the concurring opinion's assertion that such motions are both sufficient and necessary to preserve an issue for appeal.[11] Instead, the concurring opinion supports the assertion that such a motion is necessary by pointing to some scenarios where a postjudgment motion is required to preserve for appeal an issue arising from the trial court's decision, specifically, challenges to the sufficiency of the evidence in jury trial settings and challenges to the inadequacy of factual findings. See supra ¶ 15. However, the concurring opinion also recognizes that there are situations in which a postjudgment motion is not necessary to preserve such an issue for appeal, specifically, challenges to the sufficiency of the evidence in bench trial settings. See supra ¶ 15 n. 2. See generally State v. Larsen, 2000 UT App 106, ¶ 9 n. 4, 999 P.2d 1252 (applying to a criminal bench trial rule 52(b) of the Utah Rules of Civil Procedure, which provides that in bench trials, challenges to the sufficiency of the evidence may be raised on appeal "`whether or not the party raising the question has made in the district court an objection to such findings or has made either a motion to amend them, a motion for judgment, or a motion for a new trial'"). Although D.B.'s asserted claim falls within none of the categories addressed, the related cases may nonetheless be instructive. From those cases it appears *833 that whether a postjudgment motion is required to preserve these claims of error is dependent on the trial court's opportunity to address the issue at the time of decision. See In re K.F., 2009 UT 4, ¶¶ 61-62, 201 P.3d 985 ("A challenge to the adequacy of the court's findings is notably different from a challenge to the sufficiency of evidence. . . . It would be superfluous to demand that a party challenge the evidentiary support for a court's findings shortly after the court articulates them. But it is quite a different matter and wholly necessary for a party to challenge and thus afford the trial court `an opportunity to correct the alleged error' of inadequately detailed findings in order to provide for meaningful appellate review of the court's decision. . . . A trial court judge has the opportunity to address the sufficiency of the evidence to support the findings in his or her judgment. But a trial judge does not have the chance to address the adequacy of the findings themselves, unless that issue is brought before him or her."). As I have discussed above, the trial court had the opportunity toand didaddress the notice issue as it was rendering its decision. See supra ¶ 33. Therefore, even under the authority cited by the concurring opinion, the instant case would be one in which no postjudgment motion was required to preserve the issue for appeal.
¶ 38 In sum, I do not think that D.B. was required to raise an objection in order to preserve the error for appeal where (1) the error did not arise at trial, (2) requiring an objection as the decision was announced is not supported by the preservation rule or the purposes behind it, and (3) no postjudgment motion is necessary to preserve the issue for appeal. I would therefore directly address the issue D.B. raises on appeal. And considering the evidence and argument from trial, as properly set forth above, I do not think that D.B. was given adequate notice that the State was pursing a finding of guilt under an accomplice liability theory.[12] I would therefore reverse the determination of the trial court that D.B. committed these charges of theft and criminal trespass.
NOTES
[1] Judge Russell W. Bench participated in this case as a regular member of the Utah Court of Appeals. He retired from the court on January 1, 2010, before this decision issued. Hence, he is designated herein as a Senior Judge. See Utah Code Ann. § 78A-3-103(2) (2008); Sup. Ct. R. of Prof'l Practice 11-201(6).
[2] The eyewitness, during his testimony, identified D.B. as being one of the involved individuals who had successfully climbed over the fence and went around to the back of the trailer. He testified during direct examination by the State as follows:

Q. Okay. Is there any doubt in your mind of whether or not that's one of the boys?
A. No, sir.
Q. Did you have the opportunity to see them closer on this occasionon the event that it happened?
A. On the event as it happened, I appeared the facial features from a distance.
Q. Did the officers come and have you write a statement or anything of that nature?
A. No, sir.
Q. Did they have you identify the boys on that occasion?
A. No, sir.
Q. Okay. This individual isyou've identified in the courtroom, what was his participation?
A. I think he was the one that was jumping into the trailer over the fence.
During cross-examination, they eyewitness again identified D.B. as the individual who had climbed over the fence. He testified as follows: "Q. . . . And the boy that wasthat jumped over the fence, you identified this individual right here sitting next to me at the table? A. Yes, sir. Q. As the one that jumped over the fence and was inside? A. Yes, sir."
[3] On cross-examination, the eyewitness specifically testified as follows:

Q. Okay. What happened after you heard the clanking noise?
A. The policeI was still on the phone with them to kind of hurry because I didn't know whether they were going to leave or what. And then immediately the police came down and I [saw] them pull them over and get the boy out of the fence. . . .
. . . .
Q. Okay. And the time that he jumped over the fence, and got inside the fence there, did you watch him the whole time?
A. Yes, while I was on the phone with the police.
Q. Okay. Until the police got there, you watched him the whole time?
A. Yes.
[4] Ordinarily, I would not address the facts of the case, but in light of the dissent I point out that the juvenile court expressly found that the codefendant's testimony, upon which the dissent relies as clearly supporting liability as a principal, see infra ¶ 21, was not credible.
[5] After reviewing his report, one of the responding officers, Marco Mihailovich, testified that D.B.'s codefendant was inside the fenced-off area and D.B. was on the outside of the fence. Patrol Sergeant Steven Gowans, who arrived with officer Mihailovich and took D.B. into his custody, testified that D.B. was outside of the fence area:

Q. And what did you dowhen you approached them, what did they do?
A. One was still inside the fence. I took the other boy into custody, put handcuffs on him, and secured him in my car, then went back toOfficer Mihailovich was still standing by the fence with the other boy still trying to get back over.
Q. What was the name of the boy that you took into your custody, do you recall?
A. [D.B.]
[6] Although D.B. asserts in his opening brief that the juvenile court erred by finding accomplice liability without any motion or request by the State, he raised the plain error argument only in his reply brief. We decline to review the issue of plain error when raised for the first time in an appellant's reply brief. See Berkshires, LLC v. Sykes, 2005 UT App 536, ¶ 20, 127 P.3d 1243.
[7] I disagree with the dissent that Lankford v. Idaho, 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991), a death penalty case, is an instructive case for the issue on appeal. First, death penalty cases present a special situation which the Lankford Court recognized requires extra care and notice. See id. at 126 n. 22, 111 S.Ct. 1723 ("In the capital context, in which the threatened loss is so severe, the need for notice is even more pronounced."). Second, the Court's determination that the defendant did not receive adequate notice was largely based on the circumstances of the case. See id. at 111, 111 S.Ct. 1723 ("The unique circumstances that gives rise to concern about the adequacy of the notice in this case is the fact that, pursuant to court order, the prosecutor had formally advised the trial judge and petitioner that the [s]tate would not recommend the death penalty."). In Lankford, the Court determined that it was unrealistic to assume that the notice provided by the statute and the arraignment survived the state's response to a presentencing order where the state specifically said that it would not pursue the death penalty, and the trial court's silence following that response. See id. at 120, 111 S.Ct. 1723 ("The presentencing order entered by the trial court requiring the [s]tate to advise the court and the defendant whether it sought the death penalty, and if so, requiring the parties to specify the aggravating and mitigating circumstances on which they intended to rely, was comparable to a pretrial order limiting the issues to be tried. The purpose of such orders is to eliminate the need to address matters that are not in dispute, and thereby to save the valuable time of judges and lawyers."). The Court found that the trial court's silence had the practical effect of concealing from the parties the principal issue to be decided at the sentencing hearing, that is, whether to impose the death penalty. See id. ("There is nothing in the record after the [s]tate's response to the presentencing order and before the trial judge's remark at the end of the hearing that mentioned the possibility of a capital sentence. During the hearing, while both defense counsel and the prosecutor were arguing the merits of concurrent or consecutive, and fixed or indeterminate, terms, the silent judge was the only person in the courtroom who knew that the real issue that they should have been debating was the choice between life or death."). Such is not the situation here, neither the State nor the juvenile court made any affirmative representation or other indication that accomplice liability was not a possibility.
[8] Regarding the criminal trespass charge, D.B. argued that "[t]he fact is, he never did go into the construction yard, and, consequently, there was no criminal trespass on his behalf." Respecting the theft charge, D.B. argued "[t]he fact of the matter is that there just isn't any evidence that [D.B.] entered into the construction yard and had possession of any bolt cutters or anything else that would indicate he wasthat he, in fact, committed a theft."
[9] The juvenile court in announcing its decision explicitly discussed accomplice liability and specifically referenced Utah Code section 76-2-202 entitled, "Criminal responsibility for direct commission of offense or for conduct of another," see Utah Code Ann. § 76-2-202 (2008).
[10] Although a party is not required to file a postjudgment motion before the trial court as a prerequisite to filing an appeal, see Sittner v. Schriever, 2000 UT 45, ¶¶ 15-16, 2 P.3d 442, nor does reference to the issue in such a filing necessarily preserve the point for appeal, see LeBaron & Assocs., Inc. v. Rebel Enters., Inc., 823 P.2d 479, 484 (Utah Ct.App.1991), raising the issue after disposition would have afforded the juvenile court an opportunity to address the issue. Cf. State v. Belgard, 830 P.2d 264, 265-66 (Utah 1992) (holding that issues raised and dealt with in posttrial evidentiary hearings may be preserved for appeal).
[11] I agree with the concurring opinion that D.B. did not preserve his argument that he lacked notice of accomplice liability and that if D.B. did in fact lack notice it was necessary for him to raise the issue in a postjudgment motion. To the extent that this opinion touches on the merits of the case, it is solely in response to D.B.'s argument that preservation is irrelevant and that there was nothing to object to in order to preserve the issue of accomplice liability notice.
[1] The State also identifies three other rules that could have formed a basis for requesting postjudgment relief: rule 44(c), rule 46(a), and rule 47(b)(1)-(2) of the Utah Rules of Juvenile Procedure.
[2] I recognize that under rule 52(b) of the Utah Rules of Civil Procedure, a party may appeal the sufficiency of the evidence from a bench trial without first raising the issue before the trial court. See Utah R. Civ. P. 52(b) ("When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the district court an objection to such findings."). That is not the claim asserted here.
[1] The State did not draw a connection between these pieces of evidence in its argument before the trial court, let alone argue accomplice liability based on such a connection.
[2] For example, the lead opinion concedes in a footnote that the eyewitness unequivocally identified D.B. as the boy who crossed the fence, evidence which clearly supports a principal liability theory of guilt. See supra ¶ 3 n. 2. Yet the lead opinion does not include this fact when relating the testimony at trial, leaving the testimony simply that one boy entered the construction site and one boy acted as a lookout. See supra, ¶ 3. When the testimony is edited in this way, silent as to which role D.B. played, it then may suggest an accomplice liability theory of guilt.
[3] The lead opinion notes that the trial court found the codefendant's testimony to be not credible. See supra ¶ 3 n. 4. I simply do not see the impact of such an observation. First, the prosecution, not D.B., relied on the testimony found to be not credible. Second, the eyewitness's testimony, which the court did find to be credible, also directly supported a principal liability theory because the eyewitness said D.B. was the boy who crossed the fence and not the boy who acted as a lookout. Third, and most importantly, the trial court's ultimate determination days later as to credibility speaks nothing to the issue here whether D.B. was put on notice by the evidence and argument at trial that the State was pursuing an accomplice liability theory of guilt.
[4] Clearly the minimum notice requirements for the information are not the same as those for trial. See generally State v. Gonzales, 2002 UT App 256, ¶¶ 9-10, 56 P.3d 969 ("We find it unreasonable to require the State to give notice, at a stage as early as the filing of an information, of all possible theories that might arise, including those that do not become part of the State's case. . . . Our supreme court has stated that an information is `legally sufficient even if it consists of nothing more than an extremely summary statement of the charge.'" (emphasis added)). Indeed, it defies logic to imply that the State need not disclose its exact theory at trial. Such would mean that the State never has to disclose a theory of its case and the defense always has to prepare and defend against every possible theory, even those that are unannounced. This surely violates any notion of procedural fairness or constitutional due process rights.
[5] Although admittedly there are differences between the case at hand and the situation in Lankford, I do not see that such differences make the law and reasoning set forth in Lankford inapplicable to the instant case. First, there is no indication whatsoever in Lankford that notice is required only in capital cases. Rather, the Court explained,

In a variety of contexts, our cases have repeatedly emphasized the importance of giving the parties sufficient notice to enable them to identify the issues on which a decision may turn. In the capital context, in which the threatened loss is so severe, the need for notice is even more pronounced.
Lankford v. Idaho, 500 U.S. 110, 126 n. 22, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991) (emphases added) (citations omitted). Second, I fail to see the practical difference between the prosecution stating that it will not pursue a theory and the prosecution simply opting to forgo that theory without comment. Either way, the defendant has no notice that the issue is being considered. And regardless, "while both defense counsel and the prosecutor were arguing the merits of [principal liability], the silent judge was the only person in the courtroom who knew that the real issue that they should have been debating was [whether D.B. was guilty as an accomplice]." See id. at 120, 111 S.Ct. 1723. A defendant simply should not be convicted on a theory that is left unargued by the prosecution, regardless of whether forgoing such theory was a conscious, articulated decision on the part of the State.
[6] And I can think of no situation, either at the trial level or on appeal, where a party is allowed to raise a brand new issue or theory in rebuttal. See generally U.P.C., Inc. v. R.O.A. Gen., Inc., 1999 UT App 303, ¶ 63, 990 P.2d 945 ("To allow a party to raise new issues in its rebuttal materials is improper because it precludes the other party the opportunity to respond.").
[7] Hence, any error by the trial court in applying an accomplice liability theory was clearly prejudicial to D.B.
[8] Contrary to how it appears in the transcript, this language is not a direct quote from State v. Gonzales, 2002 UT App 256, 56 P.3d 969. Indeed, this interpretation by the trial court goes far beyond what the Gonzales court ruled. Gonzales simply provides that the State need not specifically state its intention to pursue an accomplice liability theory in the information, see id. ¶ 9, and that "a person charged with a crime has adequate notice of the possibility of accomplice liability being raised at trial because conviction of accomplice and principal liability do not require proof of different elements or proof of different quality," id. ¶ 12 (emphases added). But there is nothing in Gonzales that supports the trial court's interpretation that a defendant is not entitled to any notice before or during trial that an accomplice liability theory is being advanced. Rather, as discussed above, a defendant is entitled to some notice at trial and cannot be convicted under an accomplice liability theory that was never argued or advanced by the evidencea point that the State apparently concedes. Accordingly, I believe that basing guilt on accomplice liability without D.B. receiving notice of that theory being pursued at trial was clear error by the trial court.
[9] I also note that any objection at this point would not likely have made the trial court reconsider its decision because, in light of the arguments advanced at trial and the lack of notice regarding an accomplice liability theory, D.B.'s counsel was probably not prepared with any additional authority or an alternate reading of Gonzales to argue against the trial court's decision.
[10] Additionally, these cases involve instances where the motion gave "the trial court the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial" because it allowed the court to "reopen[] the trial when it held an evidentiary hearing to address [the] defendant's claim made in his motion to arrest judgment." State v. Belgard, 830 P.2d 264, 266 (Utah 1992). In our case, any postjudgment motion would not have served any judicial economy purpose.
[11] Further, most of those rules would allow for a new hearing or trial, which would only give the State a second opportunity to give appropriate notice and convict D.B. correctly. I see no authority supporting the notion that the State is entitled to a second bite at the apple when the lack of notice is entirely of its own creation.
[12] Indeed, I am not convinced that the State itself was aware that accomplice liability was at issue.